## Smith's Administrators v. Louisville & Nashville Railroad Company.

(Decided May 16, 1930.)

(As Modified on Denial of Rehearing December 19, 1930.)

JAMES P. GREGORY for appellant.

WOODWARD, HAMILTON & HOBSON, ASHBY M. WARREN and H. T. LIVELY for appellee.

OPINION OF THE COURT BY JUDGE GRIGSBY—Affirming.

J. Solon Smith, a car repairer in appellee's employ, was killed in the South Louisville yards about midnight on May 21, 1928, by being run over by a switch engine to which was attached a caboose. Appellant filed this suit under the Federal Employers' Liability Act (45 USCA secs. 51-59) to recover for his death, and at the conclusion of plaintiff's testimony the trial court, upon motion of appellee, directed the jury peremptorily to return a verdict for it, which was done. The court then adjudged "that the plaintiff herein go hence without day and recover nothing against the defendant herein." Appellant's motion and grounds for a new trial having been overruled, this appeal is prosecuted.

Appellee's South Louisville yards, where the accident occurred, contains at least ten parallel switch tracks running north and south, and numbered from west to east.

The engine of the defendant company and its tender was on track No. 9 in charge of an engineer and fireman. The engineer was on the right-hand side of the cab of the engine, and the fireman was on the left of the cab immediately opposite the position occupied by the engineer. The accident happened at night, while a caboose was being switched. The engine, with tender in rear and caboose attached to front end of engine, was backing southwardly, and the only illumination was a large electric lamp placed near the rear of the tender.

Smith's duties were those of a car repairer. He was accompanied by one Wilt, a car inspector. The last time

Smith was seen before the actual happening of the accident, he was in a place of safety, walking southwardly in the space between tracks No. 9 and 10 on the engineer's side of the engine. The caboose was thereafter uncoupled from another train and was coupled onto the head of the engine, the signal given for the engine to back and the engine proceeded southwardly a distance of approximately 100 feet, when the fireman heard some one holler, and almost immediately he saw Wilt, a distance of approximately 25 feet from his side of the engine, give a signal with his lantern. Upon receiving the signal, the fireman immediately said to the engineer, "That will do," meaning to stop the engine. The fireman testifies that simultaneously with the wigwagging of the lantern of Wilt, he saw an object fall under the wheels of the tender on his side of the engine, which was opposite that of the engineer. This object later proved to be the body of Smith.

The only witnesses who testified were the employees of the appellee railroad company. Engineer George J. Shreck was in charge of engine No. 968, which was on track 9. The engineer testified that while the engine was standing still he saw two men pass; did not know who they were at the time, but subsequent events proved that they were the decedent and Fred Wilt. They both had big bull's eye inspector's lanterns. These men passed toward the rear of the engine going south and passed behind the engine; after this the engineer could not see them. The engine was standing still while the brakeman was bleeding the brakes on the caboose, which was afterwards attached to engine and the signal to move given. During this time the bell was ringing automatically which under the rules it is required that the bell ring as a warning that the engine is going to move. The tender was equipped with an electric light, located on top of the tender and about three feet from the rear. This light, owing to its altitude and location, did not light the track 15 or 20 feet to the rear of the engine, but the rays of light fell on the track about 10 or 15 feet to the rear of the tender, and did light the track for at least 300 feet beyond that point. The engineer further testified that, when he received the signal to move, he just barely moved off, running about 3 or 4 miles an hour, about as fast as a brisk walk. When the engine had moved about

100 feet, the fireman gave the signal to stop. The questions and the answers of the engineer are as follows:

"Q. What signal did you get? A. The fireman just hollered 'that will do.'

"Q. Was that the ordinary stop sign? A. Yes, sir.

"Q. When the fireman said 'that will do,' you did not know that any one was in distress? A. No, sir.

"Q. You did not use an emergency stop? A. I just applied the brakes like I would stop to keep from running into a car."

The engineer further testified that the engine ran 34 feet before coming to a stop; that he could stop within 10 or 15 feet if he had seen that he was going to run over something. He further testified that, in making the movements in the yard which he was making, the engineers customarily and usually ring their bell continuously.

Mr. Leslie Fletcher, switchman, testified that he saw the deceased accompanying Mr. Wilt; that they were right at the engine while he (Fletcher) was coupling the engine onto the caboose. This was in his judgment three or four minutes before he (Mr. Fletcher) gave the signal to move. At the time the accident occurred, Fletcher was on the platform of the caboose farthest from the engine, and did not see the accident. Fletcher testified that Mr. Smith, the deceased, had worked in these yards for four or five years and was thoroughly familiar with the operation of the trains in the yards and with the movements to take cabooses off the trains as they come in.

Mr. Arthur Bennett, the fireman on engine No. 968, testified that the first time his attention was called to Mr. Smith's peril he heard some one holler and at the same time he saw Mr. Wilt give what they call the "wash-out signal," which is a signal given by certain movements of the lantern and means danger. The fireman then gave the signal to the engineer by calling out "That will do." His testimony at this point is as follows:

"Q. Then what did you see in front of the engine as it was backing, I mean anything? A. Well I saw something, it looked like it was falling under-

neath the tank. I saw a lamp—something, I guess it was like that Wilt had, a car inspector's lantern.

"Q. Could you tell from what place the lantern fell with reference to the body? A. No, sir, when I saw the lantern it was just—had hit the ground and rolled a little piece.

"Q. Did you see the lantern falling from the back of the tender? A. I saw it—that was just as it was falling, I suppose from the back of the tender just as it hit the ground.

"Q. Was it near this object which you saw? Yes, sir.

"Q. Could you give us any idea as to how long after you heard this person holler it was before that engine was brought to a stop? A. I guess it was not over ten seconds."

He further testified that he gave the signal as soon as he heard the holler and saw the signal. He further testified that he had been firing for nearly thirteen years, and that the signal "that will do" is the only signal which he ever gave the engineer to stop; that the usual customary signal given by firemen to the engineer to stop is "that will do," and that signal is used by all firemen.

At the time of the trial of this case, Mr. Fred Wilt, car repairer and inspector, who was with Mr. Smith at the time of the accident, had died; however, his testimony given at the coroner's inquest was read to the jury. He testified that he and Smith were going over to track 6 from track 9.

"Q. Well how did you walk over to track 6? A. Mr. Smith was behind me at the caboose just about four feet. We were talking to the switchman, and one of the men come and let the air of the caboose, that was the last time I saw him.

"Q. Well how far did you go before this accident happened? A. Well, we covered about three car lengths.

"Q. You walked the distance of three car lengths? A. I walked from the caboose the length of the engine that was standing still, cut across the engine, that is, come from track nine over to eight, and then to seven, and from seven we intended to go over to the other train. Of course, at the time I left Mr. Smith that was the last time, the last time I

saw him, expecting him to be behind me, and when I was stepping over from seven to six I heard him holler.

"Q. You heard Smith holler? A. Yes, sir.

"Q. How far was he from you when you heard him holler? A. About two car lengths.

"Q. What was he doing at the time? A. He should have been with me, I can't answer for that.

"Q. He must have stopped didn't he? A. He must have stopped, but in between the time I went to the other tracks I didn't look back, expecting him to be behind, and I just went ahead like we usually do, and then we went out, and according to his action, I saw the reflection of his lantern, and I knowed something must have happened, and I immediately swung my lantern, and I imagined something must have happened.

"Q. How far did the engine go before he stopped the tender, about how far? A. About the same distance between from here to there (indicating).

"Q. About ten or twelve feet? A. Just about that.

"Q. Was there anything for Mr. Smith to have done in back of this engine? A. Nothing to do.

"Q. Was there anything for him to cause him to stop? A. Not that I know of."

The evidence shows that the wheels of the tender and one of the large wheels of the engine passed entirely over decedent, severing his body about the stomach. When the engine stopped, his head and part of his body were under the engine and the other part of his body was on the outside of the west rail.

The first error complained of is that the answer of appellee is insufficient as a traverse of the allegations of the petition. An examination of the pleadings discloses that the defendant in its answer denied "that by gross, or any negligence or recklessness or carelessness it ran or caused to be run one of its engines upon, against or over the said James Solon Smith." The answer further denied "that defendant negligently or at all failed to furnish the said James Solon Smith a safe place in which to work or to perform his duties at the time referred to in the petition or that defendant's negligence or carelessness or that any negligence or carelessness on the part of

the defendant contributed to bring about or cause the alleged injuries to the decedent, or that the defendant was guilty of gross, or any negligence, or carelessness or recklessness or in any way contributed to the injuries of which the plaintiff's decedent died." The defendant further denied "that the conditions where the decedent worked were unsafe or that any unsafe conditions were known to the defendant or could have been known to it and also denied that the actual condition and surroundings where the decedent was working were not known to decedent or could have been known to him by the exercise of ordinary care." We are of opinion that the answer was sufficient.

The other grounds relied upon for reversal are (1) the negligent operation of the engine; and (2) that the appellant did not furnish the decedent a safe place in which to work; and (3) that it was the duty of the railroad company's employees after discovering the perilous condition of Smith to exercise ordinary care to avoid injuring him.

Considering these grounds in their reverse order, we are of the opinion that, after the peril of the decedent was discovered, it was humanly impossible to have saved decedent's life. He was falling under the tender at the time his peril was discovered and a movement of the engine of 10 or 15 feet, which according to the testimony was the shortest space in which the engine could have been stopped, would have resulted fatally to the decedent.

As to the contention of a safe place in which to work, Mr. Jewell Holman testified as to the condition of the track at the point where decedent was killed; testifying that there were some small lumps of coal and some brake shoes scattered on the ground. There is no evidence, however, that these small pieces of coal or brake shoes in any way contributed to the death of decedent. All of the other witnesses testified that the ground was covered with cinders and was smooth.

As to the first contention, all of the proof in this case showed that the decedent had no duties to perform at the back of the engine tender, but his duties required him to be at track 6, and that from the time he passed Engineer Schreck, following closely behind Wilt, he had ample time to have crossed the track as he was only about four feet behind Wilt and Wilt had crossed track 9 on which the engine was located and also track 8, and

was crossing track 7 at the time the accident occurred. Our conclusion from the record is that it is impossible to tell just how the fatal accident occurred, and, the rule of law which is applicable to the facts proven in this case is:

"It is incumbent on one seeking to recover for injuries to establish, not only the injury and the negligence, but also that the negligence was the proximate cause of the injury, and where under all the evidence the injury may as reasonably be .attributed to some cause independent of the negligence proved for which defendant would not be responsible as to negligence, the case should not be submitted to the jury." Daugherty's Administrator v. L. & N. R. R. Co., 206 Ky. 325, 267 S. W. 151, 152, and cases therein cited.

We are therefore of opinion that for the reasons indicated the lower court did not err in granting a peremptory instruction, and the judgment is therefore affirmed.